181 S.W.3d 505 (2005)
In the Interest of J.C.B.
No. 14-04-00795-CV.
Court of Appeals of Texas, Houston (14th Dist.).
December 1, 2005.
*506 John Lewis Blair, Brazoria, TX, for appellants.
Peggy Sue Bittick, Pearland, TX, for appellees.
Panel consists of Justices FOWLER, EDELMAN, and GUZMAN.

OPINION
RICHARD H. EDELMAN, Justice.
John Lewis Blair ("Blair") appeals the termination of his parental rights on the ground that the evidence was factually insufficient[1] to show that termination was in the best interest of the child ("J.C.B."). We affirm.

Background and Procedural History
J.C.B. was placed in foster care with Michael Bernstein and Linda Cerisano (the "foster parents") in 1999, before his first birthday, after he was discovered unattended and cold in a car while his mother was in a bar. Although CPS eventually placed him with his paternal grandparents, Lester and Joann Linscombe (the "Linscombes"), the foster parents and their two children remained in contact with J.C.B., visiting at least every two weeks. When Mrs. Linscombe later became ill, the Linscombes voluntarily placed J.C.B. back with the foster parents. The foster parents filed a petition to terminate the parental rights of J.C.B.'s mother, who later voluntarily relinquished her rights. The foster parents also filed a petition to terminate Blair's parental rights, and a jury trial resulted in an order of termination in 2004.[2]

*507 Standard of Review
A decision to terminate parental rights must be supported by clear and convincing evidence. In re J.L., 163 S.W.3d 79, 84 (Tex.2005). In a factual sufficiency review, the inquiry is whether: (1) the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations; and (2) the disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding. In re J.F.C., 96 S.W.3d 256, 266 (Tex.2002). If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a fact finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient. Id.

Best Interest of the Child
To terminate parental rights, it must be found that: (1) the parent committed one of the acts prohibited under section 161.001(1) of the Texas Family Code, and (2) the termination of parental rights is in the child's best interest. TEX. FAM.CODE ANN. § 161.001(1)-(2) (Vernon 2002); In re J.L., 163 S.W.3d at 84. Because Blair does not challenge the jury finding that he committed prohibited acts, we review only whether termination was in J.C.B.'s best interest.[3] The jury charge in this case instructed the jury as follows:[4] You will be required to determine whether termination of the parent-child relationship in this case would be in the best interest of the child. Some factors to consider in determining the best interest of the child are 
1. the desires of the child,
2. the emotional and physical needs of the child now and in the future,
3. any emotional and physical danger to the child now and in the future,
4. the parenting ability of the individuals seeking custody,
5. the programs available to assist those individuals to promote the best interest of the child,
6. the plans for the child by those individuals or by the agency seeking custody,
7. the stability of the home or proposed placement,
8. the acts or omissions of the parent that may indicate that the existing parent-child relationship is not a proper one, and
9. any excuse for the acts or omissions of the parent.
During trial, the jury heard testimony that: (1) Blair had a drinking problem; (2) Blair spent two years in jail for driving while intoxicated; (3) according to Blair's first ex-wife, Audrey Morain ("Morain"), Blair had abused his step-grandchild, was abusive towards her and her three children, introduced the children to drugs and alcohol, admitted to sexually molesting the oldest step-daughter, and persuaded his step-son to take responsibility for shooting *508 a pig (a felony), when, in fact, Blair had shot the pig;[5] (4) within the past year, Blair had sent several sexually inappropriate letters to his adult step-daughter (these letters were admitted into evidence); (5) J.C.B. needed long-term therapy; (6) J.C.B. had been in foster care with the foster parents for most of his life; the foster parents have a stable home life, whereas Blair is living in a utility room at his sister's house; (7) the foster parents have stable, long-term jobs, whereas Blair was unemployed when he first got out of jail, although he is now employed making $12.00 per hour; (8) Blair did not provide any financial support for J.C.B. while he was in the Linscombes' or the foster parents' care until ordered to do so by the court; (9) Mr. Linscombe, Blair's step-father, testified that he believed termination was in J.C.B.'s best interest (without specifying why); (10) although Blair testified he wanted to get his own place for his family, he had not saved any money to do so; (11) J.C.B. identified the foster parents as his parents to the court-appointed counselor; (12) the court-appointed counselor recommended that J.C.B. stay with the foster parents; (13) the therapist, Toni Jo Lindstrom, was concerned about Blair's parenting skills because, not only did none of his three step children he raised turn out to be commendable citizens, but Blair underestimated J.C.B.'s psychological history; and (14) the supervised visitation coordinator had to talk twice to Blair because he was getting too rough on the playground with J.C.B. and on a hot day Blair sprayed water on J.C.B.
The foregoing evidence is unquestionably sufficient to support a finding that Blair should not have full parental rights or even a managing conservatorship. However, the ultimate question was whether it was in J.C.B.'s best interest to potentially have no relationship or contact whatever with his father (and only remaining biological parent with parental rights), even on a supervised basis. The only evidence that would support this finding was that: (1) J.C.B. stated several times before, and on his way to, scheduled visits that he did not want to go but wanted to stay home; (2) after J.C.B. returned from his visits with Blair he would yell at his foster parents, be very demanding and impatient, and would have nightmares; and (3) J.C.B. would exhibit extremely odd behavior after visiting with Blair, such as once excusing himself from the kitchen, going to the garage, and urinating on various items, including boxes, toys, a laundry rack, and a cabinet.
On the other hand, the evidence that termination was not in the child's best interest included that: (1) after being released from prison, Blair successfully completed parole, obtained a good job, and is paying $200 per month in child support; (2) Blair complied with all the requirements asked of him by children's services and took a parenting class and an alcohol treatment class; (3) Blair did not miss any visits with J.C.B. scheduled at the childcare center; and (4) during the visits, J.C.B. appeared to be happy with Blair and his interactions with J.C.B. were parental.[6]
In addition, Blair's probation officer, Bruce Foster, testified he conducted numerous unannounced visits to Blair's residence *509 over time, spending over eighty hours on the investigation, and never saw any signs of alcohol or anything illegal. When asked, Foster did not recommend termination, but did recommend that custody remain with the foster parents, with Blair receiving gradually increasing visitation with his son.
Similarly, the guardian ad litem, James Robertson, also did not recommend termination, but instead recommended that Blair be the possessory conservator, with the foster parents being managing conservators. He testified that he saw Blair and J.C.B. interact one time, that the interaction was very good, and that J.C.B. wanted to keep a relationship with Blair. Robertson had spent about ninety hours on the case, doing an independent investigation and also relying on the reports, statements, and information obtained from others.
Moreover, much of Morain's testimony was rebutted by the testimony of two of her children, Stephanie and Raymond, who testified that Blair did not introduce them to drugs or alcohol, and that Blair was not physically abusive towards them. Raymond testified that, if anybody was physically abusive, it was Morain, and Stephanie testified that Morain hit her inappropriately. Stephanie testified that Morain was not truthful at all, and described her own relationship with Blair as very close, letting him watch her own children. Raymond stated that Blair did not get him to take the blame for shooting the pig. Further, Judith Mosqueda, Blair's sister, also testified that Morain was not truthful, and that Morain was never taken to the hospital for any injuries due to fighting with Blair. Stephanie also confirmed that Morain did not go to the hospital after fighting with Blair.
It is apparent from our record that, despite his past, and his many significant shortcomings, Blair has made a concerted effort to improve himself and to maintain his relationship with J.C.B. In addition, although there are undoubtedly advantages to J.C.B. in being formally adopted by the foster parents, our record does not address the possible effects on him of completely severing the relationship that he has developed with his father, and that much of the evidence indicated was beneficial to J.C.B. Under these circumstances, the factual sufficiency of the evidence supporting the best interest finding, particularly under a clear and convincing evidence standard, is very close; but, depending on his or her assessment of the weight and credibility of the respective items of evidence, a reasonable factfinder could form a firm belief or conviction that termination was in J.C.B.'s best interest. Accordingly, Blair's sole point of error is overruled; and the judgment of the trial court is affirmed.
NOTES
[1] Blair does not challenge the legal sufficiency of the evidence.
[2] Blair then filed a notice of appeal within the prescribed time limit for an accelerated appeal. See TEX. FAM.CODE ANN. § 109.002(a) (Vernon 2002); TEX.R.App. P. 26.1(b); In re K.A.F., 160 S.W.3d 923, 925 (Tex.2005). After Blair filed his appeal on August 9, 2004, appellees had an additional fourteen days in which to file their notice of appeal. See TEX.R.APP. P. 26.1(d). They did not file a notice of appeal until September 9, 2004; thus, it was untimely filed and is therefore dismissed.
[3] However, evidence of acts or omissions under section 161.001(1) may also be probative of the child's best interest. See In re C.H., 89 S.W.3d 17, 28 (Tex.2002).
[4] This charge comports with the Texas Pattern Jury charge regarding termination. See COMM. ON PATTERN JURY CHARGES, STATE BAR OF TEX. TEXAS PATTERN JURY CHARGES  FAMILY PJC 218.1 (2003); see also Holley v. Adams, 544 S.W.2d 367, 371-72 (Tex.1976).
[5] J.C.B. never testified at trial. The foster mom testified that she and her husband became foster parents after they had applied to become foster/adoptive parents with the combined program. The foster parents initiated the termination of the parent-child relationship between J.C.B. and his biological parents. Thus, it appears that the foster parents planned to adopt J.C.B. once the biological parents' rights were terminated.
[6] However, many of Blair's improvements came about because he was instructed to attend classes and programs, or ordered by the trial court to pay child support, not due to his own initiative. Similarly, in spite of his long history of excessive drinking, Blair does not attend AA because he doesn't feel there is a need to do so.